# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

ACSTAR INSURANCE CO.,
    Plaintiff,

v.

CLEAN HARBORS, INC., et al.,
    Defendants.

No. 3:09cv1261 (SRU)

## RULING ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The plaintiff, ACSTAR Insurance Company ("ACSTAR"), and the defendants, Clean Harbors, Inc. and Clean Harbors Environmental Services, Inc. (collectively, "Clean Harbors"), filed cross motions for partial summary judgment.[1] The issue to be decided is whether ACSTAR, Clean Harbors' reinsurer, is entitled to a declaratory judgment that it has no contractual duty to defend and indemnify Clean Harbors in a collateral lawsuit because Clean Harbors impaired ACSTAR's subrogation rights. For the reasons set forth herein, summary judgment is granted to Clean Harbors and denied to ACSTAR.

## I.    Background

The facts of this case are essentially undisputed. In 1991, Clean Harbors contracted to perform environmental testing on a McDonnell Douglas Truck Services, Inc. ("McDonnell Douglas") truck leasing and servicing site in Egg Harbor, New Jersey. Clean Harbors' responsibilities were to investigate whether, and the extent to which, McDonnell Douglas's underground fuel tanks were emitting petroleum hyrdocarbons into the soil. Clean Harbors' insurer was United Coastal Insurance Company ("United Coastal"), an Arizona corporation with its principal place of business in Connecticut. In 2005, ACSTAR became United Coastal's

---

[1] Boeing Capital Corporation and McDonnell Douglas Truck Services, Inc., the other two defendants in this case, were not involved in these summary judgment motions.

reinsurer and became the administrator for all claims and liabilities arising from United Coastal's policies.

In order to perform the contracted environmental testing at the Egg Harbor McDonnell Douglas site, Clean Harbors subcontracted a third party, Trinity Drilling Company, Inc. ("Trinity"), to drill into the ground and collect soil samples that Clean Harbors would analyze for the presence of pollutants. Trinity was insured by United States Fire & Guaranty Insurance Company ("USF&G"). On February 12, 1991, in the course of performing the subcontracted drilling, Trinity struck a McDonnell Douglas underground tank, causing fuel to leak into the surrounding soil. On March 8, 1991, Clean Harbors notified United Coastal via memorandum about the accident. That communication informed United Coastal about Trinity's insurance contract with USF&G and that Clean Harbors would keep United Coastal posted about any future developments regarding the spill cleanup and damage.

Thereafter, Clean Harbors initiated a lawsuit against Trinity to declare Trinity liable for the Egg Harbor spill. Clean Harbors ultimately settled with Trinity in 1997 for $38,000, in exchange for Clean Harbors' release of its claims against Trinity. Clean Harbors agreed to the settlement because it believed Trinity would not have been indemnified by USF&G, whose policy contained a pollution exclusion, and $38,000 represented the best settlement that Clean Harbors could obtain in light of Trinity's financial condition. Section (1)(d)(ii) of the USF&G pollution exclusion provides that Trinity's insurance policy does not cover:

> [B]odily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations . . . if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

Pl. Ex. I, doc. # IL 09 28 05 86. Clean Harbors did not notify United Coastal about anything relating to the Egg Harbor spill, including its release of claims against Trinity, until 2007.

In 2009, McDonnell Douglas and its corporate parent, Boeing Capital Corporation ("Boeing"), sued Clean Harbors in the District of New Jersey to recover costs relating to the Egg Harbor spill. *See* Docket, *Boeing Capital Corp. v. Clean Harbors Envtl. Servs., Inc.*, No. 1:09cv2820 (RBK-AMD) (D.N.J.). Boeing and McDonnell Douglas allege damages of $1,345,662.36 for expenses already spent cleaning up the spill, as well as another $5 to $7 million in expected costs to complete remediating the Egg Harbor site. In a letter dated July 13, 2009, ACSTAR agreed to defend Clean Harbors against Boeing and McDonnell Douglas, but reserved the right to seek a declaratory judgment that the United Coastal policy did not provide coverage to Clean Harbors for the Egg Harbor spill. On August 6, 2009, ACSTAR acted on that reservation of rights by filing this diversity action for a declaratory judgment under 28 U.S.C. § 2201(a).

In its complaint, ACSTAR puts forward several bases for why it is not obligated to defend and indemnify Clean Harbors, including Clean Harbors' failure to notify United Coastal and/or ACSTAR promptly of Boeing and McDonnell Douglas's claims against it, and Clean Harbors' agreement to reimburse Boeing and McDonnell Douglas without first obtaining United Coastal and/or ACSTAR's permission. *See* Cmplt. ¶¶ 37-52 (doc. # 1). The partial summary judgment motions under consideration take up only one of ACSTAR's theories: that, by agreeing to the release in favor of Trinity, Clean Harbors breached the subrogation clause in the United Coastal insurance policy, thereby relieving ACSTAR of the duty to defend and indemnify. That subrogation clause provides:

> In the event of any payment under this policy, the Company shall be subrogated to all the INSURED's rights of recovery therefor against any

> person or organization and the INSURED shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The INSURED shall do nothing after loss to prejudice such rights.

Pl. Ex. K at 7. ACSTAR contends that Clean Harbors' settlement with Trinity breached the last sentence of the subrogation clause because the release prejudiced ACSTAR's subrogation rights. ACSTAR argues that Clean Harbors should never have negotiated the release with Trinity but, instead, should have permitted United Coastal and/or ACSTAR to pursue as subrogees Clean Harbors' claims against Trinity and its insurer, USF&G. ACSTAR maintains that, at the very least, Clean Harbors had a duty to inform its insurer about Trinity's settlement offer before agreeing to the release.

Finally, before oral argument, ACSTAR represented to the court that, in the course of ACSTAR's defense of Clean Harbors in the District of New Jersey, Clean Harbors exhausted its coverage under the United Coastal policy. Therefore, in addition to the declaratory judgment holding ACSTAR not responsible for defending and indemnifying Clean Harbors, ACSTAR seeks reimbursement of the litigation costs it has expended.

## II. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

**III. Discussion**

Clean Harbors is entitled to summary judgment — and, conversely, ACSTAR's summary judgment motion must be denied — for two reasons. First, Clean Harbors did not violate the subrogation clause of the ACSTAR policy because the record is undisputed that ACSTAR lacks subrogation rights under the so-called "made-whole" rule (also known as the "make-whole" rule). And, second, even assuming that ACSTAR does have subrogation rights, Clean Harbors did not prejudice them because the pollution exclusion in Trinity's insurance policy with USF&G disclaimed coverage of the Egg Harbor spill, and there is no evidence to suggest that $38,000 represented an undervaluation of Trinity's assets.

  A. <u>Subrogation and the "made-whole" rule</u>

> The doctrine of subrogation is based upon principles of equity; its purpose is to afford relief to those required, as insurers, to pay a legal obligation that ought, in equity and good conscience, to have been met by another. . . . The general rule is that an insurer's right to subrogation attaches, by operation of law, on paying an insured's loss. . . . At that time, the insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, and the insurer succeeds to all the procedural rights and remedies possessed by the insured.

*Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 105-06 (2d Cir. 1992) (quotations and citations omitted).

ACSTAR contends that, under the United Coastal insurance agreement, it was subrogated to Clean Harbors' claims against Trinity for causing the underground oil spill at McDonnell Douglas's Egg Harbor site, and that Clean Harbors' release of Trinity from liability prejudiced

- 6 -

ACSTAR's subrogation rights. In support, ACSTAR cites several decisions, including one from this circuit, for the proposition that an insured may prejudice an insurer's subrogation rights by settling with a third party and, moreover, that such prejudice may eliminate the insurer's obligation to provide coverage under the policy. *See id.* at 106 ("When an insured settles with or releases a third party from liability for a loss that the third party has caused, the insurer's subrogation right against such party may be destroyed."); *Stolaruk Corp. v. Central Nat'l Ins. Co. of Omaha*, 522 N.W.2d 670 (Mich. Ct. App. 1994) (holding, in case involving subrogation language similar to United Coastal policy, that insurer did not have to indemnify insured because insured prejudiced insurer's contractual subrogation rights by releasing third party from liability); *Ins. Co. of N. Am. v. Abiouness*, 313 S.E.2d 663 (Va. 1984) (same).

Clean Harbors responds that ACSTAR is not entitled to a declaratory judgment because ACSTAR does not have any existing or potential subrogation rights with respect to the Egg Harbor spill and, lacking those subrogation rights, ACSTAR could not have been prejudiced by Clean Harbors' release of Trinity from liability. In other words, Clean Harbors disputes the assumption underlying ACSTAR's theory of relief: because ACSTAR is incapable of being a subrogee, Clean Harbors was similarly incapable of breaching the insurance policy's subrogation clause by prejudicing ACSTAR's purported subrogation rights. Therefore, Clean Harbors asserts that ACSTAR must defend it in the Egg Harbor action and indemnify Clean Harbors to the full extent provided for in the United Coastal policy.

Clean Harbors' argument rests on the application of the "made-whole" rule, an equitable doctrine holding that an insurer may not become a subrogee and assert claims on behalf of the insured, or subrogor, until the insured has been fully compensated for its loss.

> [I]t is widely held that in the absence of contrary statutory law or valid contractual obligations to the contrary, the general rule under the doctrine of

> equitable subrogation is that where an insured is entitled to receive recovery for the same loss from more than one source, e.g., the insurer and the tortfeasor, it is only after the insured has been fully compensated for all of the loss that the insurer acquires a right to subrogation, or is entitled to enforce its subrogation rights. The rule applies as well to instances in which the insured has recovered from the third party and the insurer attempts to exercise its subrogation right by way of reimbursement against the insured's recovery.

Lee R. Russ & Thomas F. Segalla, 16 *Couch on Insurance 3d* § 223:134 (2005). Clean Harbors professes that ACSTAR cannot make it whole under the United Coastal insurance agreement because Clean Harbors faces potential damages exceeding $1,000,000, which represents the limit of its insurance coverage for a single loss. *See* Pl. Ex. K. ACSTAR, in turn, argues that it has subrogation rights because the policy's subrogation clause overrode the made-whole rule. ACSTAR claims that clause's conditioning of subrogation on "the event of *any* payment under this policy," *id.* at 7 (emphasis added), demonstrates the parties' intent that the made-whole rule not apply.

Although derived from equity, the made-whole rule nevertheless has effect when parties establish subrogation rights by contract. Specifically, the made-whole rule applies to contracts that do not address when an insurer's subrogation rights arise. The rule, in other words, "exists only when the parties are silent. It is a gap filler." *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1297 (7th Cir. 1993); *accord Cagle v. Bruner*, 112 F.3d 1510, 1520-21 (11th Cir. 1997) (per curiam) ("State courts generally treat the make whole doctrine as a default rule that is read into insurance contracts, except where it is explicitly excluded."); *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) (recognizing "generally accepted rule that, in the absence of a clear contract provision to the contrary, an insured must be made whole before an insurer can enforce its right to subrogation"). The purpose of the made-whole rule is to place "the burden of loss . . . on the party paid to assume the risk, and not on an inadequately compensated insured, who is the least able to shoulder the

loss." 16 *Crouch on Insurance 3d* § 223:136. "The rule comes into play only if without it the operation of the subrogation clause would, by making the insured in effect pay back the policy benefits with money he has received for another loss caused by the injury that gave rise to the policy claim, leave him with an uncompensated injury." *Cutting*, 993 F.2d at 1298.

Subrogation is a common law doctrine, and the parties have not squarely addressed which state's common law governs this dispute. Instead, ACSTAR and Clean Harbors have marshaled cases from a multiplicity of state and federal jurisdictions to support their positions. ACSTAR seemingly submits that this dispute is governed by Connecticut law, *see* Pl. Mem. 8, and Clean Harbors does not appear to disagree. But it is not obvious from the record whether applying Connecticut's choice-of-law provisions yields that result.

The court has jurisdiction to decide ACSTAR's lawsuit pursuant to 28 U.S.C. § 1332(a); therefore, I apply Connecticut's choice-of-law rules. *Bakalar v. Vavra*, 619 F.3d 136, 139 (2d Cir. 2010). This case presents a contest over the meaning and application of Clean Harbors' insurance policy with United Coastal, a contract that was entered into in Connecticut. *See* Pl. Ex. K (United Coastal's policy originating from Connecticut). Connecticut, however, has "abandoned the ancient *lex loci contractus* approach to choice of law" for "the 'most significant relationship' approach of the Restatement (Second) of Conflict of Laws." *Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007) (quotation omitted). Under that approach, Connecticut presumptively applies "the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship . . . , in which event the local law of the other state will be applied." *Id.* at 462 (quoting Restatement (Second) Conflict of Laws § 193). From the record, the most likely candidate for the "principal location" during

the policy's term is New Jersey, where the Egg Harbor accident occurred, which would create a presumption in favor of applying New Jersey, and not Connecticut, law. But Clean Harbors could have had simultaneous projects in other states covered by the United Coastal insurance agreement, and there is no evidence regarding the primacy of the McDonnell Douglas testing during the policy period. Unfortunately, the parties did not discuss in their briefing whether New Jersey, Connecticut, or some other state has the most "significant relationship" to this lawsuit, as the term is defined under Connecticut's choice-of-law doctrine.

For the purposes of deciding this motion, however, the choice-of-law question is not dispositive because Connecticut and New Jersey, the two presumptive states whose law should be applied, have essentially identical positions with respect to the made-whole rule. In both states, the made-whole rule is a default rule that applies unless the parties to the insurance agreement expressly contract around it. *See Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc.*, No. 3:08cv364 (CFD), 2010 WL 420041, at *2 (D. Conn. Feb. 1, 2010) (applying made-whole rule in insurance dispute resolved under Connecticut law); *Wasko v. Manella*, 269 Conn. 527, 537 (2004) (noting in dicta that, unless an insurance policy states otherwise, "under traditional principles of subrogation, if an insured brings an action against a negligent party, an insurer generally is entitled to recover the amount it paid to the insured only if the amount of damages awarded exceeds the difference between the amount the insurer paid and the insured's actual damages"); *Culver v. Ins. Co. of N. Am.*, 115 N.J. 451, 457 (1989) ("In the absence of express terms in the contract to the contrary, [the insured] must be made or kept whole before the insurer may recover anything from him or a third party under its right of subrogation." (quotation omitted)). ACSTAR and Clean Harbors stipulate that the made-whole rule is a contracting default rule in this case. But they disagree whether the subrogation clause of the United Coastal

policy, which conditions subrogation on "any payment" made by the insurer, overrides the rule's application.

ACSTAR provides one case from the Court of Federal Claims interpreting policy language similar to the United Coastal subrogation clause to mean that the insurer subrogates to the insured's claims upon the insurer's payment for *any* loss, regardless whether the insurer's payment fully compensates the insured for its injury. *See Am. Int'l Specialty Lines Ins. Co. v. United States*, No. 05-1020 C, 2008 WL 1990859, at *11 (Fed. Cl. Jan. 31, 2008) (holding that policy language similar to the United Coastal subrogation clause gave insurer right of subrogation upon "any" payment, which established suit's ripeness for adjudication). On the other hand, there is also case law, including law from this district, holding that language similar to the United Coastal subrogation clause is insufficient to contract out of the made-whole rule. *See, e.g.*, *Cagle*, 112 F.3d at 1513, 1521-22 (holding that clause granting insurer subrogation rights "if payments are made under the Plan" to the insured was insufficient to override made-whole rule); *Barnes*, 64 F.3d at 1393, 1395 (holding that clause granting insurer subrogation rights "if this plan makes payment" to the insured was insufficient to override made-whole rule); *In re DeLucia*, 261 B.R. 561, 566-67 (Bankr. D. Conn. 2001) (holding that clause granting insurer subrogation rights "[i]n the event that any payments are made under the Plan" was insufficient to override made-whole rule).

The decisions favoring Clean Harbors provide more persuasive authority. When parties to a contract use a settled legal term in the agreement, "an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617-18 (2d Cir. 2001). In

other words, when the parties to an insurance contract invoke the term "subrogation," a court will interpret it consistent with its legal meaning absent some instruction in the contract that the word is to be understood differently. The United Coastal subrogation clause is phrased in general language without any reference to a particularized meaning for the term "subrogation;" the only suggestion in its text that the standard understanding of subrogation and its attendant doctrine do not apply is the use of the words "any payment." Those two words are a thin basis for fundamentally altering the meaning and effect of the word "subrogation" in the clause.

If ACSTAR's argument were to prevail, then the United Coastal subrogation clause would be transformed into a general assignment of claims upon a single payment by the insurer, regardless of how small that payment is relative to the insured's total loss. *See Cutting*, 993 F.2d at 1298. Such a result would benefit the insurer relative to the insured and would transfer the risk of loss from the insurer, who was paid to assume that risk, to the insured, who paid a premium to avoid that risk. *See* 16 *Crouch on Insurance 3d* § 223:136. Put more plainly, it would deprive an insured of full compensation when the insured's injuries are greater than the insurer's coverage under the policy. "If insurance contracts required the insured to assign any tort claims he might have to the insurer, the price of the insurance would be lower but effective coverage would also be lower. The insured would recover only the policy limits, and not his full damages, even in a case in which a judgment had been secured against the tortfeasor, and collected, for those damages." *Cutting*, 993 F.2d at 1298.[2] In order for a subrogation clause to

---

[2] The *Cutting* Court did hold that general subrogation boilerplate like the United Coastal policy was sufficient to override the made-whole rule. 993 F.2d at 1299. *Cutting*, however, concerned a review of an administrator's interpretation of an ERISA retirement plan, which could only be overturned if it was found to be arbitrary and capricious. *Id.* at 1295-96. The *Cutting* Court upheld the plan's interpretation under that deferential standard because the Court could not "say that the company was *unreasonable* in interpreting this plan as disclaiming that made-whole principle." *Id.* at 1299 (emphasis in original). Because of *Cutting*'s anomalous

be rendered a general assignment of claims, there must be clearer language in the insurance contract establishing that intent. The vague boilerplate of the United Coastal policy will not suffice.

Although *American International*, on which ACSTAR principally relies, reached a contrary conclusion, it did not consider the legal or practical implications of its decision. And understandably so: in that case, the question of subrogation was germane to whether the plaintiff insurance company's subrogation action against the United States was ripe for adjudication. The plaintiff had paid only part of the insured's claim when it commenced suit, and whether that payment triggered subrogation rights was questionable; furthermore, shortly after filing suit, the insurance company fully compensated the insured for its losses, which arguably would have mooted the ripeness challenge. *See Am. Int'l*, 2008 WL 1990859, at *11. The *American International* Court was not presented with the potential problem of an insured being deprived of full compensation because of the subrogation clause's interpretation. Rather, the subrogation clause was interpreted in the vacuum of a ripeness determination made at the motion to dismiss stage. I therefore do not find *American International* compelling authority and, instead, rely on the other case law requiring more specific language to contract out of the made-whole doctrine.

ACSTAR does cite one District of Connecticut case supporting its position: *Fireman's Fund Insurance Co. v. TD Banknorth Insurance Agency Inc.*, No. 3:08cv364 (CFD), 2010 WL 420041 (D. Conn. Feb. 1, 2010). In *Fireman's Fund*, however, the key issue that the Court determined was whether the insured was entitled to recover its deductible from its insurer following the insurer's settlement with a third party responsible for the insured's loss. *Id.* at *2.

---

procedural posture, I do not consider it particularly helpful to ACSTAR's argument for summary judgment, which I must consider *de novo*.

The *Fireman's Fund* Court's discussion of the made-whole doctrine was an alternative basis for decision and, therefore, arguably dicta. Moreover, the language of the purported subrogation clause at issue in *Fireman's Fund* was significantly different than the subrogation clause of the United Coastal policy. In *Fireman's Fund*, the policy provided: "If any insured has rights to recover all or part of any payment we have made under this policy, *those rights are transferred* to us. The insured must do nothing after loss to impair them." *Id.* at *3 (emphasis added). Notably absent from the clause is any mention of the word "subrogation"; rather, the language is framed in terms of a "transfer" of rights. The clause does not on its face invoke subrogation and its doctrinal accoutrements, such as the made-whole rule. Instead, it is phrased as an express contractual assignment of rights.

The *Fireman's Fund* Court's alternative holding that the made-whole rule did not apply rested primarily on the purported subrogation clause's use of the words "any payment we have made under this policy." But the Court also highlighted that the language "those rights are transferred to us" acted to override application of the made-whole rule. *Id.* at *4. The plain meaning of the clause in *Fireman's Fund* reveals that it was not in fact a subrogation clause, but was a contractual assignment of rights upon which the equitable made-whole rule had no bearing. Because the purported subrogation clause in *Fireman's Fund* is distinguishable from the subrogation clause in this case, I do not find the reasoning of *Fireman's Fund* to be helpful to ACSTAR.

The United Coastal subrogation clause did not expressly override the made-whole rule. For that reason, Clean Harbors' motion for partial summary judgment is granted and ACSTAR's motion is denied. The United Coastal policy will not make Clean Harbors whole if Clean Harbors is found liable to the full extent of the damages Boeing and McDonnell Douglas are

seeking in the Egg Harbor litigation. Because ACSTAR will not be able to exercise any subrogation rights under the United Coastal policy, Clean Harbors cannot be said to have prejudiced those rights by releasing Trinity from liability.

  B. <u>Prejudice and the USF&G pollution exclusion</u>

In addition, even assuming ACSTAR has subrogation rights, its partial summary judgment motion is still denied because Clean Harbors did not prejudice ACSTAR's subrogation rights by settling with Trinity. ACSTAR argues that it was prejudiced because Clean Harbors' release of Trinity prevented ACSTAR from pursuing damages against Trinity's insurer, USF&G. To prevail on this claim, Clean Harbors must have been mistaken regarding its interpretation of USF&G's pollution exclusion, which, in relevant part, disclaimed insurance coverage for losses arising from damage "at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations . . . if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants." Pl. Ex. I, doc. # IL 09 28 05 86.

ACSTAR argues that Trinity was not engaged in "operations to test for [or] monitor . . . pollutants" because its contract with Clean Harbors was only to drill and collect soil samples, and not to actually "test for" or "monitor" pollutants, which was Clean Harbors' responsibility. That argument, however, hinges on a strained reading of the USF&G pollution exclusion. Trinity was subcontracted to perform work not just related to but in furtherance of pollution testing and monitoring; indeed, it is impossible to disentangle Trinity's subcontracted drilling from the environmental testing that Clean Harbors was contracted to perform. The intent behind the USF&G pollution exclusion was not just to secure the insurer against possible claims that could occur in the narrow course of "test[ing]" or "monitor[ing]" pollutants — which, as Clean

Harbors convincingly posits, would be limited to work in a laboratory, where potentially catastrophic losses are unlikely to occur and where employees of Trinity, a *drilling* company, are even less likely to be found. See Defs.' Mem. 18 (doc. # 67). To the contrary, the more natural interpretation of the pollution exclusion is that it bars coverage of claims arising from the process of testing and monitoring, which, in the case of underground pollution, must include boring to extract a sample to be tested and/or to install equipment to monitor for the presence of pollutants.

*Oscar W. Larson Co. v. United Capitol Insurance Co.*, 64 F.3d 1010 (6th Cir. 1995), which ACSTAR cites in support of its position, is not inconsistent with my interpretation of the USF&G pollution exclusion. Although *Larson* dealt with the same pollution exclusion language, what was in dispute there was whether the installation of a containment system for an existing gas pipeline qualified as "contain[ment]" within the meaning of the pollution exclusion. The *Larson* Court held that it did not because the pollution exclusion proscribed only claims relating to the containment of existing pollutants in the ground, and not a containment system installed to prevent an intact pipeline from dispersing pollutants in the future. *Id.* at 1014. None of that discussion is relevant to this case, which concerns an entirely different set of facts. The issue in this case is whether the words "test for, monitor . . . the pollutants" are properly interpreted to apply to Trinity's drilling to collect soil samples in order for Clean Harbors to determine whether the McDonnell Douglas site had been polluted. *Larson*'s interpretation of the word "contain" in the pollution exclusion is inapposite to the present dispute.

Clean Harbors is correct that the USF&G policy would exclude coverage of Trinity's drilling. Given that there is no contest regarding the reasonableness of the $38,000 Clean Harbors received from Trinity in the settlement, ACSTAR was not prejudiced by Clean Harbors'

release in favor of Trinity. For this independent reason, Clean Harbors' motion for partial summary judgment is granted and ACSTAR's partial summary judgment motion is denied.

## IV.     Conclusion

For the reasons stated above, ACSTAR lacked subrogation rights under the United Coastal policy and was not prejudiced by Clean Harbors' release of Trinity from liability. Clean Harbors did not breach the United Coastal subrogation clause and, on that ground, ACSTAR is not entitled to a declaratory judgment relieving it of its duty to defend and indemnify Clean Harbors. I therefore grant Clean Harbors' motion for partial summary judgment (doc. # 66) and deny ACSTAR's motion for partial summary judgment (doc. # 60) on its subrogation claim. In issuing this order, however, I note that I have not decided the remaining bases for relief ACSTAR pled in its complaint. This case will be scheduled for trial.

It is so ordered.

Dated at Bridgeport, Connecticut, this 2nd day of March 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge